[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
(ORDERS)
APPEARANCES:
JOHN TATE, Pro Se
 ELLEN PLASIL, ESQUIRE
P.O. Box 3337 Newtown, CT 06470-3337 — For Intervenor, Mrs. Corona
 CYNTHIA HARTWELL-RUSSELL, ESQUIRE 240 Main St., 2nd Floor Danbury, CT 06810 — For Mrs. Tate
CELESTE BRAMANTI CT Page 3255-a Court Reporter
THE COURT: Alright, I'm prepared to rule. The parties were married on September 6 in 1992 for the first time and again on November 15th, 1995 at Danbury, Connecticut. It is unclear whether or not the initial marriage was or was not legitimate. I make no finding as to that. But for all intents and purposes, I think we're safe to say that the date of the marriage was November 15th, 1995. We know there are no uncertainties regarding date.
The parties — all of the jurisdictional requirements have been met. The parties have one minor child born issue of the marriage, Nicholas John. And I am going to mispronounce this again, Ferria Tate, born November 25th, 1993. The plaintiff, Mr. Tate is receiving assistance from the Department of Social Services, the State of Connecticut. I don't know whether that counts under our rules as assistance. I don't think it's what was contemplated but I thought I should mention it for purpose of the decision.
The marriage of the parties has broken down irretrievably. The same is hereby dissolved. The paternal grandmother, Rita Corona, has intervened in this matter seeking custody of the minor child. For the record, this matter, Docket 0324793, has been consolidated for hearing with Dockets number 0324201, which was disposed of, that's a restraining order file which is marked disposed of. It was sent for more history. And Docket 0325773, a matter transfered from the probate court of the district of Danbury.
With the concurrence of counsel who initiated the probate court proceeding, I am going to dismiss the probate court proceedings and have its ruling superseded by the — any rulings that might be entered therein superseded by the rulings in the dissolution. I don't think anybody's rights are prejudiced thereby. And that way, the record is clear that all of the orders are being entered in the dissolution file.
The restraining order file is here because I also asked that all files be forwarded so that I have knowledge of whether such files exist. Under the circumstances in this case it was probably important to do so because of the disagreement regarding orders and whatever else. So it was helpful for the Court to be able to see all of the files. CT Page 3256
The Court has read all of the statutory criteria, contained in Connecticut General Statutes 46b-96, 81, 82, 84, and whatever the number is about third parties which I just —
MS. HARTWELL-RUSSELL: I believe that's 59, your Honor.
THE COURT: Thanks. I'm just double checking.
MS. FOSTER: Your Honor, I have 46b-57. I have a copy of it.
THE COURT: 46b-57, 46b-59 as well regarding visitation intervention by a person. The plaintiff and the defendant met in 1992 in a bar, were married approximately — were married a few months after they met. At that time the defendant was here from her native Brazil on a tourist visa. Their marriage was a tempestuous one marked by alcohol abuse and violence. The parties had instituted a prior dissolution and reconciled.
Their pattern of a somewhat chaotic and tempestuous relationship remains unaltered through those events. The plaintiff admits that he has an alcohol problem for which he has sought assistance in the past pursuant to a 1994 arrest in which both of the parties were interviewed and submitted to alcohol evaluations. Mr. Wolf, the alcohol evaluator at that time felt that both parties minimized their consumption of alcohol and the problems which alcohol posed for them.
At that time, Mr. Tate did go to A/A meetings. He went so far as to obtain a sponsor. But as he testified in court here today, after achieving some months of sobriety, felt he was doing okay and didn't need the meetings anymore and stopped going. As is often the tale with people who make that decision, fell off the wagon eventually. And last Christmas, despite the history between the parties, spent part of that day drinking with his estranged wife.
He admitted on the stand that he could not at this time care for his son if he were not living in his mother's home. He's a well-intended parent. And in many ways responsible, certainly loves his son. But as his mother testified, the problem with alcohol that he currently endures affects his choice of friends, companions, his stability. And at this time he's not a suitable sole custodian for his son because, as he put it, he needs the time to be able to get things in order, attend to some of the CT Page 3257 difficulties he's having. And needs the assistance of his mother for — needs the assistance of support in his family in attending his son while he attempts to get back on his feet and make some headway, vis-a-vis, the issues that have been causing his problems.
Mrs. Tate faces a deportation hearing in the near future — in March, I believe. While this fact itself is in no way dispositive of the proceeding, the actions which underlie that proceeding, as well as the defendant's actions in regard to her child, make relatively clear the outcome of this case. The defendant is a citizen of Brazil. In the past she has threatened to leave the country and take the minor child with her. During the trial she took the 5th Amendment in response to questions regarding her work status and use of the false social security number.
Despite the fact that Nicholas was scheduled for open heart surgery, the defendant said that she wanted to leave the country and take him with her. She did not do this. But when the minor child was hospitalized for the surgery to close the hole in his heart, she left the hospital before the surgery, before authorizations were completed, and did not return for hours. She told no one she was leaving. Despite the efforts of her husband, the doctors, the hospital social workers, she could not be found or located. She was not there when the child emerged from surgery.
She can not remember not only the hospital, not even the city where her son's surgery occurred. She doesn't know the name of the surgeon. She administered drugs to him obtained in Brazil without the knowledge or permission of his physician. The entire incident surrounding her behavior, the care of the child during the surgery, makes highly questionable her judgment, her predictability, her consistency, despite what I believe is her legitimate love for her son.
Again, despite the fact that she loves Nicholas, she has been inattentive to his supervision and welfare. She has left him unattended at a swimming pool in her yard. While questioned during the proceedings she tended to minimize this because it was a small wading pool with a small amount of water. I might be the only person in the room who knows that Jim Thorpe died in inches of water. And certainly for a child so small, any water in a pool, and a child unattended, is a risk that no parent can ever CT Page 3258 take.
The statistics tell us, if you want to go look at this information, that Nicholas is in fact in the danger group for drowning. At that age he was the age of the child most likely to have drowned in a backyard pool. Nicholas was also left with a baby sitter so overburdened that the child was able to wonder off at a tender age and to be found later alone on the streets of Danbury, had to be transported to the hospital by the police. That incident, as well as others, gave rise to an investigation with the Department of Children and Families which led to a finding of substantiated neglect on the part of the mother.
The mother has been the subject of fifteen complaints to DCF, seven of which were substantiated. She has a poor relationship with the older child, older daughter from her first marriage. She has a conviction for assault of that child. She has another daughter from a prior relationship. Her judgment and care in regard to this child are utterly lacking as well.
Neighbors have testified that the girl is essentially left to fend for herself, and was so left at the age of six. She was found inappropriately dressed for the weather. She was left alone in the mornings by her mother directed to take herself over to a neighbor's house with or without prior arrangement. She was not fed breakfast, fixed her own lunch which consisted of Koolaid and crackers. Neighbors fed her, neighbors clothed her, neighbors took her to school, neighbors attended to her welfare.
Even though the neighbors and teachers asked the defendant to fill out forms for school lunch programs, she did not. On the day that they moved into a new residence she was left with neighbors, complete strangers to her, unknown to her as to their fitness to take care of her child. Again, these neighbors were relied on to watch the child with or without prior arrangement or beyond the arrangement that had been made. The defendant provided them no way to contact her, no phone number, and only the number for a pager which she then reported to them was lost.
It is absolutely clear from the evidence of both of the parties who the Court found — both of the neighbors who the Court found to be credible, sincere witnesses concerned only for the welfare of the child involved — that the child was in fact left alone. Even when not left alone, left in the care of a neighbor for long hours. The defendant, when she came home during CT Page 3259 the day knowing that her daughter was next door, home for periods of time the witnesses said between fifteen minutes to an hour, didn't stop by to say hello. Not so much as a wave.
The child was sent to school ill enough that a teacher and a neighbor determined that the child had to be removed and taken home. There was no way to reach her mother to let her know of the child's illness. The child in fact had appendicitis and required surgery. Following the child's release from the hospital after surgery, doubled over in pain, unable to walk, crying from the distress which she felt, she was left by her mother again in the care of a neighbor. No medical instructions, no doctor's name, no phone number.
The neighbors, thank God, called DCF. The neighbor who spent the most time taking care of Andressa reported that the child was unsupervised and neglected. Her homework was not done, nor checked. She wasn't fed properly. She told all that to DCF. DCF asked that she sign a complaint demanded a complaint be signed, and signed it in writing with her name on it. She was frightened to do so. She was frightened because next door to her chaos reined. In the home occupied by the defendant there was fighting, yelling, and screaming continuously. Loud noises, violent arguments, car windows being smashed, fighting in the driveway in the presence of children. The neighbor testified that Mrs. Tate was always fighting or yelling. And that she was afraid of her.
Based on her criminal record she had good reason to be afraid of her. The defendant was arrested and convicted for the stabbing of her husband, Mr. Tate. In 1996 she was convicted of three separate assaults, two stemming from her break-in at the intervenor's home, the other from her assault on her own seventeen year old daughter. She was on probation for those three assaults. She has been involved in incidents of domestic violence, both as the perpetrator and as the victim. Charges are currently pending against her for an incident which involves alleged assaults on both Mr. Tate and her boyfriend.
Despite the mountain of evidence which points to her unsuitability as a primary care taker of this or perhaps any other child, she insists that the problems lie with everyone else; her mother-in-law, her husband, opposing counsel, Nicholas, the attorney for the minor child; all are somehow banded together in a conspiracy to deprive her of her child. She has asked the Court for sanctions against those counsel. She contemplates a CT Page 3260 lawsuit against the psychologist, she asserts that the child was kept from her in contravention of court orders.
The Court finds that there is no merit to this. What is the truth is that there was confusion as to the status of the orders of the Court. Pursuant to the restraining order file, each of the parties was to have alternating weeks of visitation. This order technically expired at the end of the ninety day restraining order.
While it is true, and Judge Axelrod noted that restraining orders may be continued until further order of the Court, that one was not. And the visitation order does not independently survive the terms of the restraining order to which it is attached. Once the order expires, there is no pending case which gives rise to a dispute over which the superior Court has jurisdiction.
The Court in and of itself does not have personal jurisdiction over parties who are living apart who have a child, unless there is currently pending a dissolution action, an action under the statute which allows parties living apart or a restraining order file. At the time that the restraining order expired, none of those other files existed. There was not intentional withholding of visitation in violation of Court orders in this file or in any other file pending before the Superior Court.
At the time — and the Court wants to note this clearly for the record — at the time that the visitation ended with the defendant under the restraining order, the dissolution action was pending. The defendant had an opportunity to petition the Court for a hearing regarding custody and visitation and she did so. But did not choose to go forward at that date nor at any other date. For a long period of time the defendant claims that others, in the word of her counsel, determined that she could only see her child under supervision. She believes this was an extra-legal act, the determination being made by the attorney for the minor child, the opposing parties, and counsel and a child psychologist.
Again, this claim is without merit. Certainly, it was suggested by all of those people that from the interests of Nicholas' safety, because of the questions regarding the defendant's judgment and ability to supervise, that the child be CT Page 3261 seen in a supervised setting by his mom until people could get more information about what was going on.
The defendant remained free at all times if she didn't like this arrangement to petition the Court for a hearing — there was a pending dissolution file — to reclaim the motion which she herself had filed. The more credible evidence before the Court that explains the long period of time in which there was not consistent time spent with Nicholas and mom is that the defendant's desire to see or contact her child was erratic. The lack of contact with her child was more the product of her chaotic and impuslive life than any plot or conspiricy on the part of the participants of this action.
In all of the time that the child has resided in the home of the paternal grandmother and Mr. Tate, the defendant has called the child only once, that was last Saturday. She sent no gift, she sent no card. She cancelled the visitation with the child on his birthday. She didn't even speak to him in cancelling the visitation. She has not, throughout the entire period of time which the child was supposedly taken from her, acted like a person who wished to have a consistent relationship with this child.
The only action, unequivocal action, that she took was the illegal break-in to the home of the paternal grandmother which resulted in her assault convictions. This was done in the presence of the child. The child was caught in the middle of the melee. The child in fact received a scratch during the incident. So despite the fact that she had a court, ready, willing, and able at any time to proceed upon the motion that she wished to file or that she had filed already, she chose not to do that. She chose instead to take the law into her own hands in the exercise of incredibly bad judgment, went and started a fight.
The idea that the defendant was without funds and unable to afford the services of an interpretor falls on deaf ears with this Court. I have evidence before me of her bank deposits, her earning capacity. It's unstated on her financial affidavit. It appears more likely from the deposits to her account, the hours with which she works and she tells her neighbors. She works cleaning houses being gone from six in the morning to six or seven o'clock at night. Her income is probably double what she says is making. Certainly, that's conservative given the deposits made to her account. So the idea that she could not afford the CT Page 3262 service of an interpretor for one hearing in front of the Court is unconvincing.
I have sat as a Judge for years. I have watched people with far less means come before the Court with any number of ad hoc volunteers to help with interpretative services. This has not been the case for Mrs. Tate. The defendant is intelligent, perceptive, and manipulative. Her testimony revealed that she is also a liar. It was inconsistent and terribly contradictory. She has told two or three versions of the same incident in the course of her testimony. It is clear from her behavior with other parties in this action, with the DCF worker, that she uses her language both as a sword and a shield.
I want to be clear for the record that I do not know and make no conclusion regarding Mrs. Tate's fluency in English. And that is why I have asked the State of Connecticut at its own cost, despite the fact now, having heard the evidence, I think that she should be charged. The courts of the State of Connecticut do provide interpretive services by certified court interpretors. I want there to be no question that every word of this — that this proceeding was translated, that her testimony was translated, that the orders have been translated. I want there to be no question about language or the legitmacy of the proceedings.
Mrs. Tate is not without charm. She is bright and engaging. The evidence leads me to believe that she has difficulty with alcohol. I do not know the extent to which she has difficulty with alcohol. But that whatever other problems she may have — because I do not have in front of me psychiatric or psychological information — she has a problem great enough with anger that she has four convictions for assaultive behavior. She has a life of unpredictability, instability, and violence.
Her response to situations in which she was frustrated is violence. This is not a matter of a person who is ignorant or who does not know the morals of a society. I don't profess to be an expert in Brazilian culture but I don't think assault is an accepted mode of dispute resolution there as it is not here. Her impulsivity and lack of control are her problem, not an ignorance of how to deal with people in this country.
The Court is unpersuaded by the testimony of the worker from Catholic Family Services. The witness who testified that she had CT Page 3263 been in the home and things were appropriate may well have been in the home where things appeared to be appropriate at that time. But the evidence is that when left to her own devices and not under somebody's watchful eye, the chaotic nature of Mrs. Tate's life, the people moving in and out of the home, the men who seem to either be her abuser or the abused, but whichever, with whom she again engages in domestic violence, do not leave an environment appropriate for the sound healthful and encouraging rearing of children.
It maybe alright with the worker for Catholic Family Services that an apartment in which there are small children on an upper floor of the building doesn't have a front door. And it's okay to leave it like that for two weeks. I think it's negligence. I think it's neglect of the kids. I think it's inappropriate and unacceptable.
Nicholas is not a child who has not been harmed by the chaotic life of his parents. Nicholas clearly loves both of his parents. Everybody agrees with that. Abused children love there abusers. The fact that Nicholas loves his parents does not speak to his parents' fitness to have custody of Nicholas. It is the tragedy for children like Nicholas that they may in fact love people who they cannot trust to care for them with maturity, responsibility, consistency, and concern. And that, in fact, is the tragedy in Nicholas' life, vis-a-vis, both of his parents.
When Nicholas was taken to a psychologist, first by his father and then by his grandmother, he was withdrawn and hesitant to speak. He has been witness to fights and violence his whole life. He needs peace, he needs quiet, he needs consistency. He needs consistent emotional availability on the part of his parents. He needs sobriety from his parents. He needs discipline. He needs structure. He does not need chaos.
At this time neither of the parties alone is in a position to provide those things for Nicholas. Mr. Tate has made efforts to put himself in the position where he can and will be able to provide those things for Nicholas. I hope he picks up a phone and calls his sponsor or goes to a meeting or, hopefully since Monday, has already gone to a meeting. I believe his representation that he intends to do so. But his intention at this time is not enough. Certainly not for the sole custody order which he sought. CT Page 3264
The evidence regarding Mrs. Tate is so strong, so overwhelming that I have to say for the record that I was somewhat aghast that the Department of Children and Family's resources are stretched so thin their priorities are such that they would not consider an order of temporary custody being presented to a court for Andressa. A child left alone in a home at six o'clock in the morning is at immediate risk of physical harm. Children left unsupervised at a floor level window on an upper floor are in immediate danger of physical harm. I have no jurisdiction in this matter over the little girl. But I haven't stopped thinking about her since yesterday.
Mrs. Corona is employed as a real estate agent. I believe her concern for Nicholas is sincere. I am not without reservation regarding her actions regarding the Immigration Service. But again, what she saw as the relationship between Mrs. Tate and a son who she loved, a grandchild who she felt was at risk, I can not condemn the actions of calling the service and asking for their assistance.
While it might not have been the most judicious path to take, while it might not have been what others may have done, it is not one I can condemn. And given Nicholas' state at this point, the fact that she did call INS to inform them of what they would have already found out or found out on their own anyway, that is, if there were convictions, does not stop her from being at this time the most consistent ray of hope for Nicolas' emotional wellbeing.
She has a good relationship with her son. It's apparent from their behavior here in court in terms of their testimony that they have their differences. And they're frank with each other about them. That's as good a start as any. They have been able to work well together regarding Nicholas' needs and concerns. He's been well attended to in their care. He hasn't been left alone or unsupervised. He hasn't been found near a swimming pool alone. He hasn't been found wandering the streets. He hasn't been found covered in feces. All that occurred while he was in the care of his mother.
Mrs. Corona has a stable life and home. And except for the times when it is invaded by others breaking the law, it's peaceful and quiet. She has seen to Nicholas' emotional wellbeing, his entertainment, and his education, along with her son. And the evidence before the Court is that Nicholas has thrived in this environment. CT Page 3265
In the best interest of the child, I enter the following orders, legal custody is awarded to the plaintiff and the intervenor jointly for so long as Nicholas resides in Mrs. Corona's home, which shall be his primary residence. Should Mr. Tate move — I'm indicating that the child's primary residence is to be at the home of the paternal grandmother. Whether or not Mr. Tate does or does not reside there, the joint custody order can stay in effect. Under certain situations when Mr. Tate may need to relocate for any number of reasons, Nicholas will stay there. The joint custody order stays in effect in terms of legal custody.
The Court has received enough concerns regarding the lack of judgment, inappropriate behavior in terms of discussing this matter and saying derrogatory and negative things about other parties to this matter. Regarding the mother, the Court has serious enough concerns regarding her repeated threats to take the child out of the country. And in light of the fact that she is facing deportation proceedings, visitation with the defendant shall be supervised and shall be supervised at the Family and Children's Aid Center in Danbury. Arrangements regarding visitation with the child are to be made through that agency for as many hours per week as the agency can muster up to six at the defendant's cost.
The Court orders that there be psychological and alcohol evaluations of the defendant. I'd order one of the plaintiff in terms of an alcohol evaluation but I already know he's an alcoholic and he admits he's an alcoholic. So there is no point in having the alcohol evaluation done of him. He knows what he needs to do. The only question for Mr. Tate is whether he does it.
Mrs. Tate is to make her own arrangements at whatever agency is suitable for the psychological evaluation and the alcohol evaluation. Given her language problems there may have to be certain arrangements made. I am not going to jump in the middle of that. She can make her own arrangements, that is, the appointments — the arrangements for the appointments. Those evaluations conducted are to be made within two weeks. And the evaluations completed forthwith in line with what the agencies or doctors can do.
All of the parties are to keep each other informed of their CT Page 3266 current address and telephone number and to provide each with the same within seven days of any relocation or change. Before any of the supervised visitation may take place, the defendant shall disclose her current address and phone number.
None of the parties are to consume any alcohol in the presence of Nicholas nor twelve hours before or during the visitation period. In order to assist the parties in light of the impending deportation proceeding, and so that they will not have to come back to court should a deportation occur, in the event that Mrs. Tate is no longer residing in the United States visitation shall occur in Canada.
The Court orders that visitation — because based on the report of the special master appointed by the Court, Brazil is not a signatory to certain treaties and conventions which would ensure the return of a child from Brazil or the recognition of this Court's power or jurisdiction over the child. The closest country to Nicolas' residence which observes the conventions and treaties which would ensure reciprocity and reasonable method of return for a child wrongfully kept is Canada.
So visitation may take place in Canada. The intervening grandmother and Mr. Tate shall be responsible for transporting the child to visitation. There shall be no overnight visitation. The child is to be returned to Mrs. Corona and Mr. Tate at the end of the visitation period which may run from ten in the morning until eight o'clock at night.
Again, before any visitation may occur in Canada; phone number, address must be given and Mrs. Tate's passport is surrendered to an American consolate office in the city which the visit takes place. And if there is no American consolate, to Mrs. Corona and Mr. Tate. If they do not receive her passport, visa, and other traveling papers, the visit does not need to occur. They shall return those at the end of the visit when Nicholas is secured in their custody.
The court finds that Mrs. Tate has an earning capacity of between five hundred and six hundred dollars per week based on the bank records presented to the Court. In compliance with the child support guidelines, she is ordered to pay one hundred and twenty-five dollars per week which is a deviation downwards in light of the visitation expenses which I have ordered. Subject to immediate wage withholding, it's payable through the Bureau of CT Page 3267 Support for the benefit of the custodians.
Each of the parties is ordered to maintain medical insurance as it is available for them through employment for the benefit of Nicholas. No party shall speak in a derrogatory manner about another nor behave in anyway that may hamper the child's relationship with any of the other parties. No alimony is awarded to either party. Each party shall be responsible for the liabilities listed on their financial affidavits, indemnify and hold harmless the other thereon.
Is there anything I haven't covered?
MS. FOSTER: Your Honor, I filed a motion for fees.
THE COURT: Oh, I am sorry
MS. FOSTER: I am sorry. And I just want the Court to note that the total was a hundred and fifty-nine hours. But I am asking the Court at the bottom of my chart to decrease that to ninety hours. You will see in my bold, I have an affidavit, motion, and a chart setting forth my hours. I have been representing Nicholas since August 17th of `94 to today's date of 1/30/98. So the total of a hundred and fifty-nine hours — I'm only asking this court for ninety.
THE COURT: So you're asking for the nine thousand dollars?
MS. FOSTER: Yes. My hourly rate is a hundred, your Honor.
THE COURT: Counsel, you had some question regarding that. Did you want a hearing on those fees?
MS. HARTWELL-RUSSELL: I did want to ask some questions from the affidavit she provided. There were fees enumerated along with her appointment in this case and I wanted to question her about those. If the hours reflected on her affidavit, the ninety hours as you say, go to this case and this docket alone during the pending of this action —
MS. FOSTER: It's far short of that, your Honor.
THE COURT: Then you don't —
MS. HARTWELL-RUSSELL: I have no objection. CT Page 3268
MS. FOSTER: That's one reason — I don't want any further litigation about any of this. That's why I reduced it to ninety.
THE COURT: The Court finds there is nine thousand dollars owing to the attorney for the minor child. That's a fair and reasonable fee for her services in this matter. Each of the parties is ordered — each of the three parties is ordered to pay three thousand dollars. Any amounts they have already paid is credited to the fee. Those arrangements for making those payments are to be made within the next two weeks as well. Any other areas that I have left off?
MS. FOSTER: No, your Honor.
THE COURT: I am sorry. I need to put something on the record that I forgot. Your client's passport is where?
MS. FOSTER: With me, your Honor. Your Honor, I have all of them.
THE COURT: Until such time as the deportation proceedings and all files are exausted or completed, the passport stays with Attorney Foster. It is not to be released without further order of the Court.
(WHEREUPON THIS MATTER WAS ADJOURNED)
By The Court, Elaine Gordon, J.
CERTIFICATION
I, Celeste Bramanti, a certified court reporter within and for the State of Connecticut, Middlesex County, do hereby certify the foregoing to be a true and accurate transcript of the proceedings ordered in the matter of JOHN TATE V. MARIA TATE, NO. FA 96 0324793, heard on January 30, 1998 before the Honorable Elaine Gordon, Judge of the Superior Court, One Court Street, Middletown, Connecticut.
Dated this 10th day of February, 1998.
Celeste Bramanti CT Page 3269 Court Reporter